THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

COMANCHE NATION, et al.,          )
                                  )
              Plaintiffs,         )
                                  )
vs.                               )          NO. CIV-08-849-D
                                  )
UNITED STATES OF AMERICA, et al., )
                                  )
              Defendants.         )

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

I.  Introduction:

Before the Court is the Motion for Preliminary Injunction filed by Plaintiffs in conjunction with their application for a Temporary Restraining Order [Doc. No. 2].   After notice to the Defendants, the Temporary Restraining Order [Doc. No. 6] was issued on August 18, 2008; as directed by the Court, Plaintiffs posted a $25,000.00 security bond.    Pursuant to the parties' request, the Court issued an order allowing limited discovery, scheduling deadlines, and scheduling a September 10, 2008 hearing on the preliminary injunction motion.  The  Defendants then filed a Motion to Dissolve the Temporary Restraining Order [Doc. No. 15], and the Court determined that the hearing on that motion should be consolidated with the preliminary injunction hearing.

The hearing commenced on September 10, 2008 and concluded on September 15, 2008.  On September 16, 2008,  the  Court, accompanied by party representatives and  counsel, visited the site which is the subject of this action[1].   Following the site inspection,  the Court made a brief record, describing what transpired during the site visit.

The Court has now reviewed the extensive exhibits and considered the hearing testimony,

---

[1]During the hearing the Court gave the parties advance notice of the Court's intent to visit the site, and afforded the parties an opportunity to object.  All parties ultimately requested that the visit be conducted.

the governing law,  the arguments of counsel, and the Court's observations during the site viewing.

Having done so, the Court issues the following order.

II.  Summary of Claims and Defenses:

Plaintiffs' claims in this action are based on the site selected  for the construction of a 43,000

square foot building, known as the Training Support Center ("TSC"), at Fort Sill, Oklahoma ("Ft.

Sill").  The building site is directly south of Medicine Bluffs (sometimes referred to herein as the

"Bluffs"), a natural landform which has been listed on the National Register of Historic Sites since

1974 because of its historical  importance,  its role in the founding of Fort Sill, and its religious and

cultural significance to Native Americans.

Plaintiffs assert two claims for relief:  1) a violation of the Religious Freedom and

Restoration Act ("RFRA"), 42 U.S.C. § 2000bb *et seq.*, based on the allegation that construction of

the TSC  at its current site substantially interferes with the exercise of Plaintiffs' religious beliefs;

and 2) a violation of the National Historic Preservation Act of 1966 ("NHPA"), 16 U. S. C. § 470

*et seq.*, based on the contention that Defendants failed to make a reasonable and good faith effort

to consult with the Comanche Nation to  identify and resolve any adverse effects on Medicine Bluffs

resulting from construction of the TSC.  Plaintiffs seek a permanent injunction prohibiting the

construction of the TSC  at its current site and an order directing the Defendants to initiate and

engage in a good faith consultation with Plaintiffs and other interested parties to select a new

location at a site having no adverse impact on their culture or religious practices.

In their request for a preliminary injunction, Plaintiffs seek to enjoin the Defendants from

continuing construction of the TSC  until this case can be heard on the merits.     Defendants ask

the Court  to dissolve the temporary restraining order and deny the preliminary injunction, arguing

that Plaintiffs cannot satisfy the requirements for a   preliminary injunction on either claim.

Defendants also contend that  the proposed TSC is essential to Fort Sill's ability to satisfy its

obligations under the directives of the Base Realignment and Closure ("BRAC") Commission. They

argue that  continued delay of the construction increases contract costs and risks the loss of  funding

for the TSC.

III.  Preliminary Injunction Standards:

    "A preliminary injunction serves to preserve the status quo pending a final determination of

the case on the merits." *MacArthur v.  San Juan County*, 497 F.3d 1057, 1066 (10th Cir. 2007)

(citing *Keirnan v. Utah Transit Authority*, 339 F.3d 1217, 1220 (10th Cir. 2003)).  "In issuing a

preliminary injunction, a court is primarily attempting to preserve the power to render a meaningful

decision on the merits." *Keirnan*, 339 F.3d at 1220.

    To obtain a preliminary injunction, the movant must show: 1) a substantial likelihood of

success on the merits; 2) irreparable harm to the movant if the injunction is denied; 3) the threatened

harm to the movant outweighs any harm to the opposing party if the injunction issues; and 4)

issuance of the injunction would not be adverse to the public interest.  *Heideman v. South Salt Lake

City,* 348 F. 3d 1182, 1188 (10th Cir. 2003); *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir. 2001).

If the movant can establish that the latter three requirements tip strongly in its favor, the test is

modified, and the movant may meet the requirement that there is a likelihood of success on the

merits by showing "that questions going to the merits are so serious, substantial, difficult, and

doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."

*Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002); *Fed. Lands Legal Consortium ex rel. Robart*

*Estate v. United States*, 195 F.3d 1190, 1195 (10th Cir. 1999)[2]. The Tenth Circuit has held that the irreparable harm element is satisfied where a plaintiff alleges a violation of RFRA. *Kikumura*, 242 F.3d at 963 ("courts have held that a plaintiff satisfies the irreparable harm analysis by alleging a violation of RFRA" (citations omitted)). A preliminary injunction is an extraordinary remedy which should be issued only when the movant's right to relief is clear and unequivocal. *Id.* at 955.

Because Plaintiffs in this case assert two claims for relief, the Court must determine whether Plaintiffs can satisfy these requirements as to either claim. That determination requires consideration of the elements of the claims asserted and the applicable burden of proof.

a. The RFRA claims:

The RFRA claims are asserted both by Plaintiff Arterberry individually and by the Comanche Nation on behalf of its members. Plaintiff Arterberry alleges that the location of the TSC warehouse would substantially interfere with the exercise of his personal religious beliefs as a Comanche[3]; likewise, the Nation alleges that the construction would substantially interfere with its members' exercise of their religious beliefs.

RFRA provides that the government "shall not substantially burden a person's exercise of religion." 42 U.S.C. § 2000bb-1(a). To establish a *prima facie* claim under the RFRA, a plaintiff must prove: (1) a substantial burden imposed by the federal government on a (2) sincere (3) exercise

---

[2]*The modified test does not apply where the requested relief is among the "disfavored" categories of injunctions, including those which: 1) disturb the status quo; 2) are mandatory as opposed to prohibitory; or 3) afford the movant substantially all the relief he may recover at the conclusion of a full trial on the merits.* See O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft, *389 F.3d 973, 975 (10th Cir. 2004)(per curiam),* aff'd, *546 U.S. 418 (2006). In this case, the requested relief does not fall into any of these categories, as it seeks to preserve the status quo and prohibit Defendants' proposed construction; it does not afford Plaintiffs full relief, as they also seek an order directing Defendants to initiate and engage in consultation to select an alternative construction site.*

[3]*An individual has a private right of action under RFRA:"A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U. S. C. § 2000bb-1(c).*

of religion.   42 U. S. C. § 2000bb-1(a); *Kikumura*, 242 F.3d at 960 (citing *Werner v. McCotter*, 49 F.3d 1476, 1479 n. 1 (10th Cir.), *cert. denied* 515 U.S. 1166 (1995)).  A plaintiff must establish his *prima facie* case by a preponderance of the evidence.  *United States v. Meyers*, 95 F.3d 1475, 1482 (10th Cir.1996), *cert denied,* 522 U.S. 1006 (1997).

RFRA defines "exercise of religion"  as " a religious exercise, as defined in 42 U. S. C. § 2000cc-5."  42 U. S. C. § 2000bb-2(4).   Section 2000cc-5 defines "religious exercise" as  "any exercise of religion, whether or not compelled by, or central to, a system of religious belief."[4]  42  U. S. C. § 2000cc-5(7)(A); *see also Kikumura,* 242 F.3d at 960.   The exercise of Native American traditional religious practices has been recognized as constituting an "exercise of religion" for purposes of  RFRA.  *See, e.g., United States v. Friday*, 525 F.3d 938, 946-47 (10th Cir. 2008); *United States v. Hardman*, 297 F.3d 1116, 1126-27 (10th Cir. 2002).

RFRA does not define "substantial burden."  The Tenth Circuit has defined the term by stating that a governmental action which substantially burdens a religious exercise is one which must "significantly inhibit or constrain conduct or expression" or "deny reasonable opportunities to engage in" religious activities.  *Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir. 1996) (quoting *Werner*, 49 F.3d at 1480)[5].

---

[4]*Prior to a 2000 amendment, a "religious exercise" under RFRA was construed to require that the exercise involve a central tenet of a religious system or that the plaintiff be compelled by his religious system to engage in the exercise at issue. See, e.g., Werner, 49 F.3d at 1480. The amended definition "substantially modified and relaxed" the definition of a religious exercise. See Grace United Methodist Church v. City of Cheyenne, 451 F.3d 643, 662 (10th Cir. 2006).*

[5]*Both Thiry and Werner were decided prior to the 2000 amendment changing RFRA's definition of a religious exercise, and both applied the definition of a "substantial burden" in the context of the former more restrictive definition of a religious exercise.  Defendants urge the Court to adopt a definition applied by the Ninth Circuit Court of Appeals, which has concluded that a "substantial burden" is imposed only when individuals are "forced to choose between following the tenets of their religion and receiving a governmental benefit...or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." Navajo Nation v. United States Forest Service, 535 F.3d 1058, 1070 (9th Cir. 2008).  The Tenth Circuit has not adopted that definition, and the Court declines to do so in this case.   The Tenth Circuit's consideration of RFRA subsequent to the 2000 amendment does not appear to signal a restrictive*

If a *prima facie* case is shown, the burden shifts to the government to demonstrate that the "application of the burden to the person" is 1) "in furtherance of a compelling governmental interest;" and 2) "is the least restrictive means of furthering that compelling governmental interest." 42 U. S. C. § 2000bb-1(b).   The government must satisfy this burden by a preponderance of the evidence.  *Gonzalez v. O Centro Espirita Beneficente Uniao Do Vegetal*, 526 U. S. 418, 428-29 (2006) (citing *Ashcroft v. American Civil Liberties Union*, 542 U.S. 656, 666 (2004)).

 Plaintiffs' RFRA allegations  emphasize that Medicine Bluffs  has historically  been the focus  of  sacred  Comanche  traditional  religious  practices,  and  it  continues  to  have  religious significance at the present time.  More specifically, Plaintiffs contend that the area on the south side of the Bluffs, extending at least to Randolph Road, has traditionally been an area in which religious practitioners gather to pray, to contemplate the Bluffs, to gather plants for use in healing and religious ceremonies, and to engage in sacred observances.  In addition, the southern approach  is the only access point from which tribal members may ascend to the peaks of the Bluffs, a traditional practice of known cultural and religious significance to Comanches.         Conceding that there are existing buildings on Randolph Road south of the Bluffs,  Plaintiffs contend  the proposed TSC construction  would further encroach on the last remaining open viewscape on the southern approach to the Bluffs.

Defendants  argue that construction at the proposed TSC site does not substantially burden Plaintiffs' ability to exercise their religious beliefs.  Defendants note that no construction will take place on the  Bluffs themselves, and the proposed TSC building is located  approximately 1,600 feet south of the base of the Bluffs.  According to Defendants,  they were not aware that Comanches or

---

application of RFRA.  *See*, *e.g.*, Grace United Methodist Church, 451 F.3d at 662.

other Native Americans regard the area on the south side of the Bluffs north of Randolph Road as having religious significance. Instead, they believed that only the actual Bluffs and the area on the north side of the Bluffs, where a historical marker is located, had such significance. Defendants suggest that, in any event, locating the warehouse at the selected site will not substantially interfere with Plaintiffs' exercise of their religious beliefs because the area between the north boundary of the TSC site and extending to the base of Medicine Bluffs will be unoccupied and can continue to be used for religious purposes. Defendants also argue that the Bluffs are visible and accessible from areas other than the south side of the Bluffs. Defendants emphasize that Ft. Sill regards the TSC project as essential to the fulfillment of its obligations pursuant to the directives of BRAC. As more fully explained in the factual findings herein, the BRAC directives substantially increase the number of military personnel to be trained at Ft. Sill, thus requiring additional training facilities and materials. Finally, Defendants argue that, if the TSC construction does not commence immediately, there is a significant risk that BRAC funds will no longer be available.

b. The NHPA claim:

Plaintiffs argue that Defendants also failed to comply with the NHPA regulations requiring an agency to take certain action prior to proceeding with construction or other action that might adversely impact a site of historical or cultural significance. Specifically, Plaintiffs contend that Defendants failed to comply with Section 106 of the NHPA, codified at 16 U. S. C. §470f, and the implementing regulations which direct the agency to engage in reasonable efforts and good faith consultation with interested parties prior to taking action.

Section 106 of the NHPA requires a government agency to "take into account the effect of [any] undertaking on any district, site, building, structure, or object that is included in or eligible for

inclusion in the National Register." 16 U. S. C. § 470f.  This requirement is governed by numerous federal regulations which establish a procedure generally referred to as the Section 106 process.  *See* 36 C. F. R.  § 800 *et seq.*  "The process is designed to foster communication and consultation between agency officials...and other interested parties such as Indian tribes, local governments, and the general public."  *Pueblo of Sandia v. United States*, 50 F.3d 856, 859 (10th Cir. 1995).  The agency is required to make a "reasonable and good faith effort to identify historic properties that may be affected by the undertaking." 36 C. F. R.  § 800.4(b);  *Pueblo of Sandia*, 50 F.3d at 860.  Where a plaintiff shows that the agency failed to comply with the NHPA requirements, injunctive relief may issue.  *Id.*

In initiating the Section 106 process, the agency is required to make a "reasonable and good faith effort" to identify Indian tribes who may attach "religious and cultural significance" to historic properties that may be affected by the proposed undertaking and invite them to participate as consulting parties in the Section 106 process.  36 C.F.R. § 800.2(c)(2)(ii)(A)-(D); § 800.3(f)(2).

The agency is also required to consult with interested parties, including Indian tribes, in the identification of potential affected historic properties.  To satisfy the requirement of reasonable, good faith efforts to determine potential adverse effects,  an agency is required to gather information from a variety of sources, including a review of "existing information on historic properties within the area of potential effects." 36 C. F. R. § 800.4(a)(2).  The agency is also required to "[s]eek information" from "consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area and identify issues relating to the undertaking's potential effects on historic properties."  36 C. F. R.  § 800.4(a)(3).  In addition, the agency must "[g]ather information from any Indian tribe...to assist in identifying properties,

including those located off tribal lands, which may be of religious and cultural significance to them..., recognizing that an Indian tribe...may be reluctant to divulge specific information regarding the location, nature, and activities associated with such sites."  36 C. F. R.  § 800.4(a)(4).

The agency's obligation to make a reasonable and good faith effort may include "background research, consultation, oral history interviews, sample field investigation, and field survey." § 800.4(b)(1).  The agency must "take into account" "the nature and extent of potential effects on historic properties, and the likely nature and location of historic properties within the area of potential effects." *Id*.   The area of potential effects is defined as "the geographic area or areas within which an undertaking may directly or indirectly cause alterations in the character or use of historic properties."  36 C.F.R. § 800.16(d).

The NHPA regulations also establish criteria for determining an adverse effect on a historical site:

> An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feelings, or association. Consideration shall be given to all qualifying characteristics of a historic property, including those that may have been identified subsequent to the original evaluation of the property's eligibility for the National Register.  Adverse effects may include reasonably foreseeable effects caused by the undertaking that may occur later in time, be farther removed in distance or be cumulative.

36 C. F. R.  § 800.5(a)(1).  The regulations also provide examples of adverse effects; among those listed are "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance," and "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features."  *Id.,* § 800.5(a)(2)(iv) and (v).

After applying these and other considerations, if the agency makes a finding of no adverse effect, it must notify the consulting parties of that finding, provide them with specific documentation, and allow them 30 days to review the finding. 36 C. F. R. § 800.5(b) and (c). The specific documentation which must accompany the notification of the finding of no adverse effect includes 1) a "description of the undertaking, specifying the Federal involvement, and its area of potential effects, including photographs, maps, and drawings, as necessary;" 2) a description of "the steps taken to identify historic properties;" 3) "a description of the affected historic properties, including information on the characteristics that qualify them for the National Register;" 4) a "description of the undertaking's effects on historic properties;" 5) an "explanation of why the criteria of adverse effect were found applicable or inapplicable;" and 6) "copies or summaries of any views provided by consulting parties and the public." 36 C. F. R. § 800.11(e).

Plaintiffs contend that Defendants failed to comply with the NHPA in selecting the TSC site because they did not consult in good faith with the Comanche Nation and other interested parties. Acknowledging that certain notices were sent to the Comanche Nation and other interested parties, Plaintiffs contend that the content of the notices was inadequate and, in any event, Defendants did not endeavor to consult in good faith. Plaintiffs also contend that Defendants knew about concerns regarding the cultural and religious significance of the TSC site at least as early as July 2007 and failed to consider those concerns before finalizing plans for the site.

Defendants argue that they fully complied with the NHPA regulations. Defendants contend that Plaintiffs and others were timely notified of the proposed construction, and that Plaintiffs were provided with all information required by the applicable federal regulations. However, no objections were timely received from Plaintiffs or any other interested parties. Defendants argue

that, in fact,  they received communications from the Comanche Nation indicating that there was no objection to the site selected for the TSC.   Months later, however, they were contacted by Comanche Nation officials expressing concern about the site and its impact on Medicine Bluffs and the surrounding area. Furthermore, Defendants note that  the NHPA regulations authorize an interested party to seek review of a finding that a proposed action will have no adverse effect on a National Register site; however, Plaintiffs failed to exercise their right to such review.

## IV.  Findings of Fact

1.  The Medicine Bluffs National Historic Feature is located on the Ft. Sill military installation near Lawton, Oklahoma.  Medicine Bluffs was entered on the National Register of Historic Places in 1974.  The Bluffs are located just northwest of the "New Post" portion of the Ft. Sill cantonment area; the New Post area was developed around 1911, and today is used as a senior officer housing area. New Post is within the Ft. Sill Historic District.  (*See* Government Exhibit ("G. Ex.") 36, National Register of Historic Places Inventory - Nomination Form, and attached documents; G. Ex. 42, p.2, aerial photo.)

2.  Medicine Bluffs consists of four contiguous porphyry bluffs forming a crescent a mile in length on the south side of Medicine Bluff Creek.  From the south, the terrain rises gradually to the top of the Bluffs; from the north, beginning immediately on the south side of Medicine Bluff Creek, the Bluffs rise abruptly – on the north side Bluff No. 3 consists of a sheer cliff, 310 feet high. (G. Ex. 36.)

3.  Ft. Sill was established in 1869 and was known to Native Americans in the area as "The Soldier House at Medicine Bluffs."  Indeed, the significance of Medicine Bluffs to Native Americans, and particularly the Comanche Tribe, far predates the first U. S. military expedition in the area which camped near the Bluffs in 1852.  Reports made in preparation of the establishment of Ft. Sill reflect that Native American guides informed military officials in 1868 of the sacred nature of the Bluffs by

stating "there the great spirit sometimes dwells – there the Comanche goes to drive out the bad spirit." (G. Ex. 36.)

4.  The Bluffs and surroundings are of great cultural and religious significance to Native Americans in the area, and particularly to the Comanche people.  The status of the Bluffs as a sacred site has been widely known outside of the Native American community since before the establishment of Ft. Sill.  Indeed, an historical plaque present today on the north side of the Bluffs states that the Medicine Bluffs area has been "held in deep reverence by the Indian Tribes of the area from time immemorial."

5.  Testimony from several members of the Comanche Nation established that the Bluffs remain a sacred site for the Comanche people, and are still the situs of significant aspects of traditional Comanche religious practices for hundreds of Comanches. Testimony including that of Wallace Coffey, Chairman of the Comanche Nation, and co-plaintiff Jimmy Arterberry, Jr., a member of the Comanche Tribe and  traditional religious practitioner, explained the importance of the southern approach to the Bluffs: the southern approach is the traditional route to ascend the Bluffs for Comanches making the trek to the peaks for spiritual purposes; camps were made there to support those who desired to ascend the Bluffs; sweat lodges were established along the southern approach; plants used for religious and healing practices were historically – and are today – gathered among the trees and vegetation below and on the southern slopes of the Bluffs; and the unobstructed view of all four Bluffs is central to a spiritual experience of the Bluffs, as the number four has particular spiritual significance.

6.  Testimony from members of the Comanche Nation, as well as expert testimony from Dr. Joe Watkins, University of Oklahoma Director of Native American Studies, described the traditional religious practice of the Comanche people as an intensely private spiritual experience that is

12

inextricably intertwined with the natural environment.  Traditional practitioners resist disclosing the location of their sacred sites, and generally treat such information as confidential.  Such practices rarely involve disturbance of the natural environment.  Together with the oral history tradition of many Native American tribes, these factors make it difficult to tie down Native American religious practices to a specific site or location.  Nevertheless, the testimony during the hearing made clear that the area of the Medicine Bluffs Historic Feature, *as well as* the southern approach which is particularly significant to this case, is considered sacred by the Comanche people and continues to be used for traditional religious purposes.  Plaintiff Arterberry testified that his traditional religious practice as it relates to the Bluffs involves a physical and spiritual "centering" on the gap between Bluffs 2 and 3, with a visual focus on the area called "Sweet Medicine" by the Comanche people.  This "centering" requires Mr. Arterberry to stand in the precise location of the TSC site.

7.   In connection with decisions pursuant to BRAC, Ft. Sill received approximately $7.3 million for the construction of a new Training Support Center warehouse.  (*See* G. Ex. 31, 35 % Conceptual Design Analysis, § 1.8.)  The bigger picture of the impact of the BRAC decisions is an increased role for Ft. Sill, primarily in connection with Army training missions.  As a result of BRAC, Ft. Sill will construct more than two million square feet of new building space through the year 2011 – the current deadline for implementation of BRAC projects.  (G. Ex. 30, Finding of No Impact – Base Realignment at Fort Sill, Oklahoma, p.1.)   Of this two million square feet of new construction, the TSC warehouse represents 43,000 square feet, or about 2% of the total.  (G. Ex. 31, § 3.4.)

8.   The new TSC warehouse is needed to replace aging facilities, to provide additional storage space, and to consolidate some virtual training activities currently conducted at various locations on Ft. Sill.  The TSC warehouse will be used, primarily, to store, issue, and maintain training aids, devices, and simulators such as the Army's Multiple Integrated Laser Engagement System ("MILES").

(G. Ex. 28, Final Environmental Assessment – Implementation of Base Realignment and Closure Recommendations at Fort Sill, Oklahoma, § 2.5; G. Ex. 31, § 1.1.)

9.    Currently Ft. Sill conducts training for approximately 14,000 soldiers on any given day. As a result of the BRAC realignments, the number of soldiers trained at Ft. Sill will increase to about 18,500.  The influx of additional troops is expected to be complete by the spring of 2010.  The Ft. Sill installation encompasses approximately 93,000 acres;  the Ft. Sill cantonment area (built-up area) covers about 9,000 acres.

10.   Military officials who testified at the hearing described the construction of the new TSC warehouse as a "critical BRAC project," essential for the support of the increased training mission at Ft. Sill.  The current TSC function is being served by the use of two World War II vintage buildings (Building No. 214 and 216) each providing 7,000 - 8,000 square feet of space.  The current TSC buildings are in need of repair, and are being used to their maximum capacity; about 10,000 pieces of MILES equipment are stored in the two buildings along with other training aids.  Further, several thousand pieces of MILES equipment are stored at Ft. Chaffee, Arkansas, at least in part because of storage space limitations.[6]  However, testimony revealed that Ft. Sill receives an annual budget for operations and maintenance which could provide funds for the repair and upkeep of the existing TSC buildings, but as a matter of priority those funds have not been used to refurbish Building No. 214 and 216.  Further, although military officials testified about the critical need for the new TSC warehouse, documentation describing the various BRAC-related projects does not list it among "actions required" to implement BRAC directives, or even as a "discretionary action" in support of BRAC  (*See* G. Ex. 28, §§ 2.3 and 2.4), although the project is described as an "additional action."  (*Id.*, § 2.5.)  Still other

---

[6]*Testimony also revealed that the MILES equipment stored at Ft. Chaffee is often used by Army reserve components units which regularly train at Ft. Chaffee.*

documentation does not list the new TSC project as "mission critical."  (Plaintiffs' Exhibit ("P. Ex.") 201, Ft. Sill MilCon PowerPoint slides.)

11.  The location for construction of the new TSC warehouse was selected by Mr. Francis P. LePine, the Ft. Sill Master Planner.  Mr. LePine has been the Master Planner since 1994.  In considering where to place the TSC, Mr. LePine applied the following siting criteria: 1) the TSC should be located in an "industrial" area of the installation; 2) the TSC should be centrally located physically and operationally, with access to a main road because of the considerable anticipated military vehicle traffic; and 3) because of the funding available, the selected site would have to be a relatively inexpensive site on which to build.  Based on these criteria, Mr. LePine selected "an open field within the cantonment area of the Post, approximately 900 feet northwest of the intersection of Randolph Road and Currie Road" (G. Ex. 31, § 1.1), on the north side of Randolph Road.  (*See also* G. Ex. 42, p.2.)

12.  The site selected by Mr. LePine is within the area of the southern approach to the Bluffs, 1,662 feet southwest of the southern boundary of the Medicine Bluffs National Historic Feature. (G. Ex. 42, p.2.)  The remaining, open southern approach to the Bluffs is generally bounded by Randolph Road to the south, the Ft. Sill Regional Confinement Facility[7] on the west, and Currie Road and a motorpool on the east.  From Randolph Road north to the Bluffs the area is open, bisected by a gravel tank trail and a small road leading to an old firing range known as "MB3."  The portion of this southern approach which is south of the tank trail and north of Randolph Road forms a rectangular box approximately 55 acres in size.  The area from Randolph Road up to the base of the Bluffs is vegetated with native grasses, plants, and trees.  The TSC construction site is roughly centered on the Bluffs;

---

[7]*As part of the BRAC realignment, Ft. Sill will lose the confinement facility mission beginning in approximately 2010.  The structures which currently serve as the confinement facility will then be available for other purposes.*

directly forward from the site is the gap between Bluffs 2 and 3, referred to by the Comanche people as "Sweet Medicine."   The TSC construction site naturally slopes up toward the Bluffs.   (*See* G. Ex. 42, p.2; G. Ex. 31, § 1.1.)  From the location of the TSC construction site, looking north-northeast, all four Bluffs are clearly visible.  Approximately 750 feet north on the tank trail the view is significantly restricted, with none of the peaks clearly visible.  Only with substantial clearing of native trees would the Bluffs be visible from the tank trail.

13.  Mr. LePine selected the TSC site without direct input from military commanders.  He explained during testimony that he normally does not involve the military command in site selection decisions unless he is aware that there will be "an issue" regarding a particular site.  Although Mr. LePine was generally aware that Medicine Bluffs is an area of cultural significance to Native Americans, he believed that the significant area was limited to the area north of the tank trail and up to the Bluffs themselves.  At the time he selected the site he was not aware that the viewscape north of Randolph Road up to the Bluffs from the southern approach held cultural and religious significance for Native Americans, and particularly the Comanche people.  Prior to selecting the site, however, Mr. LePine consulted with Mr. Thomas Glen Wheat, the Ft. Sill Environmental Division Chief, regarding any cultural impact issues in the area.  Mr. Wheat informed Mr. LePine that the construction would not involve any significant environmental impact in connection with cultural resources.  In light of this advice from Mr. Wheat, Mr. LePine did not include cultural impact as a site selection criteria.  Mr. LePine was unsure of the time frame when he actually made the decision regarding the location of the TSC, but evidence suggests the decision was likely made between August 2005 (the date of a report entitled "A Cultural Resources Inventory of 55 Acres, Ft. Sill Military Reservation, G. Ex. 26[8]) and

---

[8]*Significantly, this report focuses on the presence or absence of archaeological artifacts and remains, and does not mention viewscapes or the religious significance of the Bluffs and the southern approach.*

16

October 25, 2006 (the date of the pre-Charrette meeting held to "prepare the groundwork for the TSC Design Charrette"; P. Ex. 187, p.2).

14. Although Mr. LePine did not consider any alternative sites for the TSC on the basis of cultural and religious impact to Native Americans in the area, he did consider at least one alternative location when applying his site selection criteria. Mr. LePine considered a site about 2,500 feet west of the selected site along Randolph Road. The alternative site is just west of the Regional Confinement Facility, and thus is outside of the area of the remaining open southern approach to the Bluffs. The site apparently meets all three of Mr. LePine's criteria (*See supra*, ¶ 11), but was considered by him to be somewhat inferior to the selected site on the basis of availability of utilities. However, some evidence suggests that the alternative site is in fact superior to the selected site in terms of expense of construction (*see* P. Ex. 203, email suggesting the alternative site "may have been a better site from a site construction perspective with less costly site features"). Further, although as a matter of policy use of existing facilities must be considered before deciding on new construction, Mr. LePine did not seriously consider using the nearby Regional Confinement Facility as additional warehouse space, even though it will be vacated in 2010 as a result of the BRAC realignment. Mr. LePine stated that he did not believe the confinement facility structures would be suitable, but also acknowledged that he is not aware of the specific configuration of its several buildings.

15. Mr. Wheat, who has held his current position since 2001, testified that because of his "past experience" he knew that viewscapes would be an important issue in connection with the TSC project. Indeed, the minutes of the October 25, 2006 pre-Charrette[9] meeting regarding the TSC contain the following statement: "Medicine Bluffs, which are located north of the proposed site beyond the tank

---

[9]*A "Charrette" meeting is a pre-construction discussion between the end-user and the construction and design team regarding the design and construction of a structure.*

trail, are sacred to the Indian Nation.  Maintaining an acceptable viewscape from these hills will be critical from the point of view of cultural resources, since [the TSC] will be built in part of remaining open space south of the bluffs."  (P. Ex. 187, p. 5.)

16.   On September 14, 2006, Defendants, through a contractor, mailed to the Comanche Nation the draft Final Environmental Assessment and draft Finding of No Significant Impact regarding all of the BRAC-related projects on Ft. Sill. (G. Ex. 4; G. Ex. 82; G. Ex. 83.)  The draft Environmental Assessment (G. Ex. 82) is a 168- page document, including attachments.  The document identifies the TSC as a BRAC project but does not describe its precise proposed location.  A map of proposed locations appears at page 2-3, but it does not identify the location of the Bluffs,  and does not accurately reflect the location of the TSC (the TSC is depicted at the far southeast corner of the rectangular, 55 acre box – not the actual location determined by Mr. LePine).  The draft Environmental Assessment anticipates the subsequent formal consultation required by the National Historical Preservation Act, and contains this statement at page ES-5 under the heading "Cultural Resources": "Before Fort Sill would begin construction activities, it would identify historic properties, determine whether adverse impacts would occur, and develop mitigation measures, all in consultation with the Oklahoma SHPO [State Historic Preservation Officer] and appropriate federally recognized tribes." (G. Ex. 28.)

17.   The Environmental Assessment and Finding of No Significant Impact became final in November 2006.  (G. Ex. 28; G. Ex 30.)  Although a number of comments and concerns from the Comanche Nation were received and addressed by Ft. Sill, they mainly concerned issues relating to the potential impact on burial sites of the Comanche people.[10]   Because Ft. Sill environmental officials

---

[10] Contemporaneous with the comment period regarding the Environmental Assessment, a contentious matter arose between Ft. Sill and the Comanche Nation in connection with the unearthing of human remains and artifacts during construction of a Ft. Sill housing project.

generally viewed these communications as relating to non-BRAC projects, they were not deemed an impediment within the context of the BRAC Environmental Assessment. (*See, e.g.*, G. Ex. 28, Appen. C.)   Nevertheless, as Defendants point out, Lelain Wait, a Museum Program Assistant with the Comanche Nation, sent an email in October, 2006 stating that the Comanche Nation "does not have any concerns or issues with the location [of proposed construction in the 55 acre area]." (G. Ex. 28, Appen. C.)  However, the remainder of Ms. Wait's email clearly demonstrates that the subject matter of her inquiry was human remains or archeological artifacts.  This fact is made more clear by Ms. Wait's earlier letter of September 25, 2006 to the Ft. Sill Garrison Commander at that time, COL John Uberti.   Ms. Wait states in her letter that she is unfamiliar with the location of the proposed construction addressed in the Environmental Assessment, and would like additional information.  She goes on to describe several areas of concern to the Comanche Nation which "have been orally indicated by the Comanche Elders as possible burial sights for unmarked graves." (G. Ex. 28, Appen. C.)  Similarly, an October 17, 2006 letter from Comanche Nation Chairman Wallace Coffey to Mr. Wheat objecting to the finalization of the Environmental Assessment and the Finding of No Significant Impact until after the NHPA's consultation requirements were met, was treated generally as a concern about unmarked graves and archeological sites and was, for the most part, dismissed.  (G. Ex. 28, Appen. C.)

18. Mr. Towana Spivey is the Director and Curator of the Ft. Sill Museum, and has held that position since 1982.  Mr. Spivey is generally regarded as an expert on the history of Ft. Sill, and is further regarded as an extremely knowledgeable person concerning areas of Native American cultural and religious significance within the Ft. Sill installation.  Mr. Spivey's input on the potential impact of construction near Ft. Sill historic sites has often been sought by commanders and other Ft. Sill officials.  In June of 2007 Mr. Spivey became concerned about a rumor he heard regarding potential

construction near Medicine Bluffs.  He sent the following email to Mr. Wheat on June 25, 2007:

> Glen, I am hearing rumors about a new TSC facility on the north side of Randolph Road near the Medicine Bluffs.  Is this true?  If so, how did that ever get cleared?  We have always tried to protect the area north of Randolph Road because once they start building there, that will become the excuse for additional buildings.  Please say it ain't so!

(P. Ex. 14 - C.)  Mr. Wheat did not respond.

19.  Having received no response to his concern, Mr. Spivey next sent a detailed email to Mr. Timothy Haymend, who passed it on to Mr. Burl Ragland, Deputy Director of Public Works at Ft. Sill (now retired), who in turn passed it on to Mr. LePine for comment.  Mr. Spivey's July 19, 2007 email stressed the impact the TSC construction would have on the viewscape of the Bluffs from the southern approach, and underscored the cultural and religious significance of the Bluffs to Native Americans. (P. Ex. 14-D, Spivey email.)  Mr. Spivey's email included the following statements:

> Construction in this location will definitely have an adverse impact on the viewscape of the Medicine Bluffs, a site that is extremely significant to the founding of Fort Sill and also to the religious beliefs of the Southern Plains Tribes.

> \*     \*     \*

> This site has long been regarded as a sacred site by the Comanche, Kiowa, and Plains Apache Indians ... .  Individual sweat lodges, as well as camps of Kiowas and Comanches were strategically located in the basin facing the Bluffs to maximize this resource.  Tribal people continue to this day to collect cedar and sage from the immediate area of the Bluffs for use in sacred ceremonies.

> \*     \*     \*

> Fort Sill has in the past, demonstrated the foresight to protect the integrity of this site by avoiding any construction north of Randolph Road in this vicinity.

> \*     \*     \*

> The current issue involving the TSC facility is the fact that it is located

20

> outside the official boundary of the Medicine Bluffs Historic site but
> it will still have an adverse impact on the "viewscape" of the Bluffs.
>
> \*     \*     \*
>
> The fact that construction may not directly infringe on [the Bluffs']
> official boundary does not change the negative impact resulting from
> nearby construction.  There are other suitable locations available for
> the TSC facility.  There are no other Medicine Bluffs.

(P. Ex. 14-D, excerpted here.)

20.  On July 23, 2007 Mr. Spivey's email was forwarded by Mr. LePine to Mr. Wheat.  That same day Mr. LePine forwarded the email to Mr. Walter Garner, Program Manager, Army Corps of Engineers, Tulsa office, who served as the "facilitator" for the TSC project.  On July 24, 2007 Mr. Garner commented in an email "Interesting read.  We may lose the approved site for the TSC that is currently nearly 35% designed!!!"  (P. Ex. 14-F.)

21.  Also on July 23, 2007 Mr. Wheat responded by email to Mr. Ragland, Mr. Haymend, and others, including Mr. LePine, citing the November 2006 Environmental Assessment as a basis to mitigate concern over the Spivey email.  Mr. Wheat stated in part:

> The new TSC warehouse and new DRMO are both going in East of the
> [Regional Confinement Facility] and North of Randolph Road in the
> Posts BRAC Implementation Plan.   Both of these projects were
> specifically addressed in the Environmental Assessment for
> Implementation of BRAC at Fort Sill which was completed on 09
> November 2006.  The EA as [sic] staffed with the SHPO, the Native
> American Tribes affiliated with Fort Sill and the Post Museum.  To
> date no negative comments have been received other than those
> contained in Mr. Spivey's e-mail below.  The facilities will not be
> visible from the north side of the bluffs and will not dramatically affect
> the view to the south from the top of the bluffs.

(P. Ex. 14-G.) However, the Final Environmental Assessment (G. Ex. 28) never mentions viewscapes – the central point of Mr. Spivey's email – as a matter of potential impact.  Further, Mr. Spivey's concerns focused on the southern approach area and the impact on the viewscape looking up to the

Bluffs ("... it will still have an adverse impact on the 'viewscape' *of the Bluffs*" (emphasis added)); Mr. Wheat's comments address only the view from the top of the Bluffs looking south.  (P. Ex. 14-G.)  Mr. Wheat did not respond directly to Mr. Spivey at that time.

22.  On August 9, 2007 Mr. Spivey observed a drilling rig taking soil samples at the TSC construction site.  On August 10, 2007 he sent another email to Mr. Haymend, with copies to Mr. Ragland and Mr. Wheat.  Mr. Spivey stated in part:

> I believe this is an unwarranted incursion into the Medicine Bluffs Historic Site area and should be avoided. ...  I am also concerned whether the various tribal Historic Preservation Offices were advised and/or able to comment on this project. . . . [A]pparently inadequate consideration was given for an adverse impact on the historic viewscape of the Medicine Bluffs.

(P. Ex. 14-H, excerpted here.)

23.  Also on August 10, 2007 Mr. Spivey sent yet another email to Mr. Wheat in which he again warned against construction in the southern approach area of the Bluffs.  Mr. Spivey stated in part:

> It has been a long standing practise [sic] of the Post to avoid this area with any construction irregardless of the exact boundary due to the visual impact it will most definitely have on the Medicine Bluffs Historic Site.
>
> While the 310 ft. vertical, north face of the Bluffs is the most picturesque angle, the backside of the bluffs is of equal historical concern.  As I stated earlier, in the past we have considered other projects on the south side of the Bluffs as an incursion and have avoided this problem.  There are many reasons (too numerous to mention here) for concern about the viewscape south of the Medicine Bluffs.
>
> Judging from the inquiries we are receiving lately, I feel certain the tribes did not realize the proximity of this construction to the Medicine Bluffs.

(P. Ex. 14-I, excerpted here.)

24. Mr. Spivey's initial July 19, 2007 email, and most of the subsequent chain of emails from Spivey, were passed on to the current Ft. Sill Garrison Commander, COL Robert Bridgford, on August 10, 2007. As Garrison Commander, COL Bridgford is responsible for all facilities on the installation, including the TSC. COL Bridgford, a highly experienced senior Army officer, decided to go to the top of the Bluffs and observe the situation for himself. He did so that same day, and took with him Mr. Haymend, Mr. Wheat, and Mr. Kevin Christopher (a Cultural Resources Technician in Wheat's office). COL Bridgford considered the view from the top of the Bluffs to the south toward Randolph Road. He directed Mr. Wheat to "get with the tribes" and find out what their viewscape issues were; Mr. Wheat stated that the Section 106 consultation process was getting under way, and COL Bridgford told Mr. Wheat to get back to him about any issues. Mr. Wheat did not report back to COL Bridgford regarding any viewscape issues. COL Bridgford testified that he did not have a complete understanding of the religious significance of the southern approach to the Bluffs, and the significance of the viewscape issue, until he heard the testimony of the Comanche Nation members at the preliminary injunction hearing.

25. That same day – August 10, 2007 – the NHPA Section 106 notice letter was sent out to numerous consulting parties and potential consulting parties, including the Comanche Nation. (G. Ex. 16.) The letter was prepared by Mr. Christopher and signed by Mr. Wheat. Despite the numerous concerns raised by Mr. Spivey, and despite the recognition of viewscape issues in connection with construction on the last "remaining open space south of the bluffs" as early as the pre-Charrette meeting in October 2006, the Section 106 letter made no mention of the Bluffs or viewscapes to the Bluffs; nor did it provide the precise location for the new TSC warehouse.[11] The Section 106

---

[11]*In an attachment  to the letter the entire 55-acre rectangular box is identified as the area of interest. Also included with the Section 106 letter was the 35% Conceptual Design Analysis for Training Support Center Warehouse (G. Ex. 31), an approximate inch-and-a-half thick technical document detailing many aspects of the design and*

letter does, however, state the conclusion of the Army that "[t]he area of the undertaking has been determined to be clear of any cultural resources," and that "[t]he undertaking has been determined to have no effect on the Traditional, Cultural and Religious land and or historic structures... ." (G. Ex. 16.)  The letter allows for a 30 day comment period.

26.   A close reading of the 35 % Conceptual Design Analysis (G. Ex. 31) attached to the Section 106 letter reflects that, in addition to the TSC warehouse, a Defense Reutilization Management Office ("DRMO") facility is also planned for the same general area north of Randolph Road within the southern approach to the Bluffs.  (G. Ex. 31, § 1.1.)  The DRMO facility is expected to cover an area of about 20 acres within the 55-acre rectangular box north of Randolph Road.  Testimony further revealed that land within the same 55 acre area has been "notionally" set aside for a new fire station. Further, as a consequence of the construction of the TSC warehouse, "it was assumed that the number of lanes in Randolph Road would double as this area of the Ft. Sill cantonment area is built up, and that the widening of the road would take place on the north side of the road."  (G. Ex. 31, § 8.2.)

27.   The Section 106 letter (G. Ex. 16) was silent regarding the related and future construction expected in the area of the southern approach to the Bluffs, and there is no evidence that the cumulative impact of these projects was discussed with the Comanche Nation or any other consulting party.

28.   Mr. Wheat testified that he delegated to Mr. Christopher the duty of direct consultation and follow-up with the Comanche Nation.  Mr. Christopher testified that he did not become aware of the July 19, 2007 Spivey email until about a week after the Section 106 letter was mailed (the Section 106 letter was mailed on August 10, 2007).  Nevertheless, he did not follow up with anyone regarding the

---

*construction of the TSC.  Additionally, a CD Rom containing blueprints of the building and location information was included with the letter.  (G. Ex. 81.)*

concerns set forth by Mr. Spivey.  Moreover, on August 16, 2007, Mr. Christopher received an email

request from Ms. Ruth Toahty with the Comanche Nation asking for additional information regarding

the Environmental Assessment for the DRMO project, and specifically inquiring about how close the

project would be to Medicine Bluffs and the "Isolated Burial site."  (P. Ex. 156.)  Mr. Christopher

responded, in pertinent part:

> The BRAC EA covers the DRMO.  The DRMO is referred to in the
> BRAC EA as the RIPL.  The distance between the Isolated grave and
> the RIPL/DRMO is approximately 2,820 feet.  The distance as as [sic]
> measured on GIS shown the bluffs *to the back of* the DRMO/RIPL at
> approximately 2,150 feet.

(P. Ex. 156 (emphasis added).)  Later, on October 24, 2007, Ms. Toahty wrote to Mr. Wheat, again

voicing a concern about the proximity of the DRMO site (which is planned to be just to the west of the

TSC) to Medicine Bluffs.  Ms. Toahty stated in part: "I received a phone call from the Chairman of

my NAGPRA [Native American Graves Protection and Repatriation Act] Board and he was very

disturbed about the project.  He feels that it is just to [sic] close to Medicine Bluff, being that is one

of our sacred sites." (G. Ex. 20.)  Despite these contacts, Mr. Christopher did not engage any official

with the Comanche Nation on the issue of viewscapes to the Bluffs.

29.  During the 30 day period following the mailing of the Section 106 letter, the Army

received a letter from the Oklahoma Archeological Survey stating that no archaeological materials

would likely be encountered during the construction.  The letter, addressed to Mr. Wheat, concludes

by stating "you are reminded of your responsibility to consult with the appropriate Native American

tribe/groups to identify any concerns they may have pertaining to this undertaking and potential

impacts to properties of traditional and/or ceremonial value." (G. Ex. 18.)  Mr. Wheat also received

a letter dated September 6, 2007 from the Oklahoma Historical Society, Ms. Melvena Heisch, Deputy

State Historic Preservation Officer.  Ms. Heisch states in the letter her conclusion that "there are no

historic properties affected by the referenced project." (G. Ex. 19.)  Ms. Heisch testified during the preliminary injunction hearing.  In her testimony she stated that her office considers cultural practices in its assessment to the extent that the State Historic Preservation Office understands the existence of the practices.  However, regarding the significance of the Medicine Bluffs viewscapes, her understanding was that the important views were from the base of the Bluffs looking up, and from the top of the Bluffs looking north.  She further testified that if the evidence established that the traditional Native American religious practice in the area is to approach the Bluffs from the south and ascend the Bluffs from that side, it could affect her opinion of the TSC project.

30.  Also during the 30 day comment period the Army Corps of Engineers project facilitator for the TSC, Mr. Garner, sent an email to Mr. Andy Cueto, with copies to multiple recipients including Mr. Wheat and Mr. Christopher.  In the September 7, 2007 email Mr. Garner stated:

> [T]he EQD Chief[12] and I came to the conclusion that we need to avoid all the "arrows" we can from the Tribes and from SHPO[13].  The bubble skylights are a show stopper if we keep them in the design as we will have to go back to SHPO and the Tribes and offer them another 30 day review period and another window of opportunity to delay or change the project.  Help us avoid going back to them with this type of skylight.  Please Delete the bubble type skylights and design flush mount skylights or panels.  This should lower the cost as well .... [J]ust annotate SHPO concern on skylights and press on.

(P. Ex. 198 (explanatory footnotes added).)

31.  Early in 2008 the protestations from the Comanche Nation regarding the TSC intensified.  On February 15, 2008, Mr. William G. Voelker, Comanche Nation NAGPRA Chairman, wrote to Major General Peter Vangjel, Commanding General of Ft. Sill, complaining that "Medicine Bluff [sic],

---

[12] *"EQD" presumably refers to Environmental Quality Division, which is Mr. Wheat's office.*

[13] *"SHPO" refers to the State Historic Preservation Office where Ms. Heisch serves as the Deputy State Historic Preservation Officer.*

a well known unique geological feature of Fort Sill which is a place of immense spiritual and healing 'medicine' to the Comanche and other tribes alike has been placed in eminent danger by construction plans which stand to impact this sacred site for all time." (G. Ex. 21.) COL Bridgford responded in writing to Mr. Voelker on April 8, 2008. COL Bridgford stated that the TSC site was "specifically addressed" in the Environmental Assessment, and that the Comanche Nation failed to express "any issues or concerns with the property described in your letter." (G. Ex. 22.) COL Bridgford went on to state that the Section 106 "consultation letter" was sent to the Comanche Nation on August 10, 2007, and "no response was received from the Comanche Nation." COL Bridgford concluded that "Fort Sill has fulfilled its responsibility to make a reasonable and good faith effort to consult with the Comanche Nation. ... The Comanche Chairman's decision not to reply to our 106 consultation letter of August 10, 2007 along with Ms. Wait and Chairman Coffey's assertions in response to the BRAC EA are sufficient to satisfy me that the Comanche Tribe was given ample opportunity to comment on this undertaking." COL Bridgford informed Mr. Voelker that the TSC project would proceed. (G. Ex. 22.)

32.  In May 2008 Mr. Voelker responded in writing to COL Bridgford, again objecting to the TSC project and the lack of good faith consultation. (G. Ex. 23.) Later, in July 2008, a similar letter was sent to COL Bridgford and signed by the entire Comanche Nation Business Committee. The letter stated the Comanche Nation's opposition to the TSC construction, and requested the selection of an alternative location. (G. Ex. 24.)

33.  During July and August 2008 efforts were made by both sides to reach an acceptable compromise, including a face-to-face meeting at the TSC construction site, but without success. This litigation ensued.

34.  Defendants estimate that they incur $1,500 to $2,000 per day in delay-related costs each

27

day the TSC construction is enjoined.  In the event Defendants choose to terminate the contract, related

termination costs could equal approximately 40% of the contract price, but an accurate estimate of such

costs is difficult based on the information presently available to Defendants.  Further, if the current

contract is terminated it is possible that the BRAC funds tied to the contract could be redistributed to

other installations to pay for other BRAC-related projects.

## V.  Conclusions of Law

In light of the foregoing findings of fact, and the principles of law set forth in Section III,

*supra*, the Court makes the following conclusions of law.

1.  Plaintiffs have made a clear and unequivocal showing of their entitlement to preliminary

injunctive relief, and have established each element necessary for the issuance of such relief, as set

forth below.

a)      Substantial likelihood of success on the merits.[14]

Plaintiffs have demonstrated a substantial likelihood of success on the merits of their Religious

Freedom and Restoration Act claim.  The evidence clearly shows that the southern approach to

Medicine Bluffs – the land area north of Randolph Road up to the base of the Bluffs – has historically

been, and is today, a sacred site of the Comanche people.  Further, this area is the situs of traditional

religious practices of numerous Comanches – perhaps hundreds.  The practices engaged in by the

Comanche people in this land area constitute the sincere exercise of religion as defined under the

RFRA.  Construction of the TSC warehouse at its current location will impose a substantial burden on

the traditional religious practices of the Comanche people in the area of the southern approach to the

---

[14]*The "modified" standard for preliminary injunctive relief is applicable to this case.  Under the modified standard the requirement to show a substantial likelihood of success on the merits is relaxed where the balance of harm tips decidedly in the movant's favor.  <u>Davis v. Mineta</u>, 302 F.3d 1104 (10th Cir. 2002).  However, in this case the Plaintiffs have satisfied the more stringent standard as well.*

Bluffs.

The traditional religious practices of the Comanche people are inextricably intertwined with the natural environment. Their sacred ceremonies are intensely private. As these practices relate to the Bluffs, an unobstructed view of all four Bluffs is central to the spiritual experience of the Comanche people. The southern approach to the Bluffs – now restricted to the open terrain north of Randolph Road between Currie Road on the east and the Ft. Sill Regional Confinement Facility on the west – is the last remaining open, unobstructed viewscape from the south. Moreover, the southern-most portion of this area, nearest to Randolph Road, is the only available vantage point which affords a view of all four Bluffs. It is this precise area where the TSC warehouse is to be built. While it is true that the TSC facility will not occupy the entire area along the north side of Randolph Road, it will occupy the area which represents the central sight-line to the Bluffs – the area where Mr. Arterberry stands to center himself on the prominent gap between Bluffs 2 and 3 which is referenced to by the Comanches as "Sweet Medicine." The obstruction by the TSC facility in this area, along with the assumed added disruption of increased vehicular traffic, will constitute a substantial burden on the traditional religious practices of Plaintiffs. Thus, the evidence amply demonstrates the substantial likelihood that Plaintiffs can satisfy the first three elements of a claim under the RFRA, and accordingly, make out a *prima facie* case under the Act.

Once a *prima facie* case is established, the RFRA burden of proof shifts to the government to demonstrate that the substantial burden imposed upon Plaintiffs is in furtherance of a compelling governmental interest, and that the government's action is the least restrictive means of furthering that compelling governmental interest.

Although the evidence is somewhat conflicting regarding the necessity of the new TSC warehouse to the implementation of the BRAC obligations at Ft. Sill, the Court accepts the testimony

of the military officials – and primarily that of COL Bridgford – that the new TSC facility is essential to the training mission at Ft. Sill.  Thus, Defendants have substantially demonstrated that the construction of the TSC warehouse is in furtherance of a compelling governmental interest.

The record is utterly devoid, however, of facts tending to demonstrate that the construction of the TSC in its current location is the least restrictive means of furthering the compelling governmental interest.  In fact, the evidence presented establishes that a much less restrictive alternative  – constructing the TSC at the alternate location identified by Mr. LePine just west of the Regional Confinement Facility – was not seriously considered by Defendants.  Moreover, it is clear Defendants failed to consider means of fulfilling their compelling interest which would have been less restrictive of the religious practices of Plaintiffs because Defendants did not consider Plaintiffs' religious practices at all when selecting the site of the TSC.  Thus, since it is unlikely that Defendants can meet their burden under the RFRA, there is a substantial likelihood that Plaintiffs will prevail on the merits of their RFRA claim.

The conclusion regarding the likelihood of success on the RFRA claim satisfies the first element of the standard for preliminary injunctive relief, however, the Court also concludes that Plaintiffs have demonstrated a substantial likelihood of success on their claim that Defendants have not complied with the National Historic Preservation Act.

As set forth in more detail in section III (b), *supra*, Section 106 of the NHPA, as implemented by 36 C.F.R. § 800 *et seq.*, sets forth a process designed to foster communication and consultation between agency officials and other interested parties, such as Native American tribes, in connection with actions that could impact properties of historical and cultural significance.  *See, e.g., Pueblo of Sandia v. United States*, 50 F.3d 856 (10th Cir. 1995).  The NHPA requires an agency to make a reasonable and good faith effort to identify historic properties that may be impacted, and to identify

issues in connection with such potential impact.  36 C.F.R. § 800.4.  The reasonable and good faith efforts requirement extends to consultation with Native American tribes which may attach religious and cultural significance to potentially affected property.  36 C.F.R. § 800.2; § 800.3; *see also Pueblo of Sandia*, 50 F.3d at 859.  It has been said that, in a general sense, the NHPA requires agencies to "stop, look, and listen" before commencing actions which could impact historic or culturally significant properties.  *See Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 225 (5th Cir. 2006); *Neighborhood Ass'n of the Back Bay, Inc. v. Federal Transit Administration*, 463 F.3d 50, 60 (1st Cir. 2006); *Business and Residents Alliance of East Harlem v. Jackson*, 430 F.3d 584, 591 (2d Cir. 2005).

The evidence submitted during the preliminary injunction hearing substantially demonstrates Defendants' actions were contrary to the letter and the spirit of the NHPA and its implementing regulations.

For instance, required to make good faith efforts to "[s]eek information" from "consulting parties, and other individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area and identify issues relating to the undertaking's potential effects on historic properties" (36 C.F.R. § 800.4 (a)(3)), Defendants virtually ignored the concerns regarding the viewscape up to the Bluffs from the southern approach raised by Mr. Spivey long before the Section 106 notice letter was sent.  Contrary to the direction of the Ft. Sill Garrison Commander, COL Bridgford, to "get with the tribes" about their viewscape issues, that same day the Section 106 letter was sent out without a reference to Medicine Bluffs and without mentioning the potential impact on viewscapes.  Instead, the details of the TSC project were buried in technical attachments, and the consulting parties were left to ferret out for themselves the adverse impact on viewscapes then known by Defendants to exist.

Based on the information known to Defendants on August 10, 2007, the date the Section 106

31

notice letter was sent to the Comanche Nation, it is doubtful that the letter could properly contain a finding of no adverse effect, yet it did. *See* C.F.R. § 800.5. The Section 106 notice letter, however, clearly lacked the detailed disclosures and information required by 36 C.F.R. § 800.11(e).[15]

Moreover, the requirement of *good faith* consultation suggests that the consulted Native American tribes would have considered it important to know, and therefore should have been told, that the TSC warehouse was the tip of the iceberg regarding plans to build within the southern approach to the Bluffs, north of Randolph Road.  In reality, the area in question is also slated for construction of a DRMO facility (which will occupy about 20 acres), construction of a fire station, and a widening of Randolph Road on its north side.  Had this cumulative impact been disclosed to the area tribes, their initial reaction may well have been different.  As it was, the Comanche Nation began complaining in earnest in the fall of 2007 and early 2008.  These protests, asserted after the close of the 30 day comment period announced in the August 10, 2007 Section 106 letter, were brushed off by Defendants as untimely.  Having concluded that they technically complied with the Section 106 process, Defendants decided to proceed with the TSC project despite the mounting objections from the Comanche Nation.

As noted above, it has been said that the NHPA requires an agency to "stop, look and listen" (*Coliseum Square Ass'n, Inc.,* 465  F.3d at 225); the evidence in the present case suggests that Defendants merely paused, glanced, and turned a deaf ear to warnings of adverse impact.  Thus, Defendants' efforts fell short of the reasonable and good faith efforts required by the law.  Where a plaintiff shows that an agency failed to comply with the NHPA requirements, injunctive relief may issue. *Sandia,* 50 F.3d at 860.

      b)        Irreparable harm to the movant if the injunction is denied.

---

[15]*See supra*, § 3(b), p.10 for a listing of the required contents of the Section 106 notification.

Absent preliminary injunctive relief, the construction of the TSC warehouse will proceed.  The construction of a permanent structure on a site considered sacred by the Comanche people, and the substantial burden the presence of the structure would impose on their traditional religious practices as detailed *supra*, would constitute irreparable harm.

    c)  The threatened harm to the movant must outweigh any harm to the opposing party if the injunction is granted.

The Court is not insensitive to the economic harm Defendants estimate will occur in the event of further delay, or termination, of the TSC project.  However, the monetary damages Defendants may incur if an injunction issues pale in comparison to the prospect of irreparable harm to sacred lands and centuries-old religious traditions which would occur absent injunctive relief.

    d)  Issuance of the injunction would not be adverse to the public interest.

The protection and preservation of historic landmarks and traditional cultural and religious practices tied to such lands, consistent with expressions of public policy such as the RFRA and the NHPA, is not contrary to the public interest.

  2.  In light of the factual findings set forth in § IV *supra*, and the conclusions of law outlined above, a preliminary injunction pursuant to Fed. R. Civ. P. 65 should issue enjoining Defendants, during the pendency of this action, from commencing or continuing construction, including earthwork, foundation preparation, or related activities, of the Training Support Center at its current planned location.

  3.  For the same reasons which compel the issuance of a preliminary injunction , Defendants' Motion to Dissolve Temporary Restraining Order [Doc. No. 15] should be denied.

  4.  In light of the findings and conclusions set forth herein, the security bond previously posted by Plaintiffs is considered adequate as security in connection with the issuance of preliminary

injunctive relief.

<u>O R D E R</u>

It is therefore ordered, adjudged, and decreed that Defendants' Motion to Dissolve Temporary Restraining Order [Doc. No. 15] is DENIED; and Plaintiffs' Motion for Preliminary Injunction is GRANTED.

Defendants are hereby preliminarily enjoined from commencing or continuing construction, including earthwork, foundation preparation or related activities, of the Training Support Center at the current planned site location on the north side of Randolph Road and south of Medicine Bluffs at the Fort Sill, Oklahoma military installation.  This injunction applies to Defendants and their agents and employees and those otherwise acting on behalf of Defendants.  This injunction shall remain in full force and effect until this action can be determined on the merits or until further order of the Court.

Pursuant to Fed. R .Civ .P. 65(c) Plaintiffs posted a bond in the amount of $25,000.00 as security for the issuance of the Temporary Restraining Order [Doc. No. 6] entered herein on August 18, 2008.  As set forth above, the Court finds that the amount of the bond is sufficient and adequate security in connection with this preliminary injunction, and the Court directs Plaintiffs to forthwith file with the Clerk of Court all necessary documents so as to make such bond applicable to this preliminary injunction.

IT IS SO ORDERED this 23rd day of September, 2008.


_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE